UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>USTOCKTRADE LLC and<br>ANTHONY WEERESINGHE,<br><br>　　　　　Defendants. | Case No. 1:23-cv-6756<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges the following:

### SUMMARY

1. Defendants Ustocktrade LLC ("Ustocktrade") and Anthony Weeresinghe ("Weeresinghe") substantially assisted a broker-dealer's repeated violations of the SEC's net capital requirements. Ustocktrade owned the broker-dealer, and Weeresinghe owned and controlled Ustocktrade.

2. The net capital provisions of the federal securities laws are designed to ensure that broker-dealers have adequate liquid assets to meet their obligations to their customers and creditors.

3. Ustocktrade Securities, Inc. (the "Broker-Dealer") operated an alternative trading system that was marketed to college students and other retail investors to engage in day trading in securities listed on the New York Stock Exchange ("NYSE") and Nasdaq Stock Market ("NASDAQ"). Alternative trading systems use platforms to match buy and sell orders among

customers.  Weeresinghe owned and controlled Ustocktrade, which was responsible for much of the Broker-Dealer's operations, including operating the Broker-Dealer's trading platforms.

4. Based on the Broker-Dealer's business activity, it was prohibited from operating a securities business if its net capital dropped below $250,000.

5. The Broker-Dealer was not profitable and relied on voluntary infusions of cash that Weeresinghe paid through Ustocktrade.  Weeresinghe and Ustocktrade, however, underfunded the Broker-Dealer.  Consequently, the Broker-Dealer's net capital dropped below the $250,000 minimum threshold during 11 periods in 2021.

6. An officer of the Broker-Dealer repeatedly requested that Weeresinghe make capital infusions and warned Weeresinghe that the Broker-Dealer must cease operations while net capital deficient.  Nevertheless, Weeresinghe and Ustocktrade failed to timely provide the Broker-Dealer sufficient funds to meet the minimum net capital requirement and continued to operate the Broker-Dealer's customer trading platforms to illegally conduct securities transactions when the Broker-Dealer was net capital deficient.

7. By engaging in the conduct described herein, the Broker-Dealer violated, and Weeresinghe and Ustocktrade aided and abetted the Broker-Dealer's violations of, the net capital provisions of Section 15(c)(3) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(c)(3), and Rule 15c3-l thereunder, 17 C.F.R. § 240.15c3-1.

8. As a result of Defendants' conduct, the SEC seeks permanent injunctive relief and civil money penalties.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

10. The Court has personal jurisdiction over Weeresinghe and Ustocktrade, and venue is proper in this district, under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain acts and transactions constituting the violations occurred in this district. For example, the unlawful securities transactions while the Broker-Dealer was net capital deficient involved securities that traded on the NYSE and NASDAQ, which are located in this district.

## DEFENDANTS

11. **Ustocktrade LLC (Ustocktrade)** is a privately-held company headquartered in Newton, Massachusetts that develops and markets financial technology for the securities and brokerage industry. It is the parent company of the broker-dealer Ustocktrade Securities, Inc. (Broker-Dealer). Pursuant to an agreement with the Broker-Dealer, Ustocktrade was responsible for much of the Broker-Dealer's operations.

12. **Anthony Weeresinghe**, age 60, is a resident of Chestnut Hill, Massachusetts. Weeresinghe is the founder, owner, CEO, and chairman of Ustocktrade. In 2014, Weeresinghe and Ustocktrade purchased the Broker-Dealer as a broker-dealer shell company. Thereafter, Weeresinghe served on the Broker-Dealer's board of directors.

## RELEVANT ENTITY

13. **Ustocktrade Securities, Inc. (Broker-Dealer)** is a Pennsylvania corporation headquartered in Newton, Massachusetts, and a wholly-owned subsidiary of Ustocktrade. It was registered with the SEC as a broker-dealer from about 1982 through October 2022. In October 2022, the Broker-Dealer withdrew and terminated its registration with the SEC.

## FACTS

### I. The Roles of the Broker-Dealer, Ustocktrade and Weeresinghe

14. In 2014, Weeresinghe founded Ustocktrade and purchased the Broker-Dealer. Weeresinghe is the sole member and owner of Ustocktrade, and he served on the Broker-Dealer's board of directors.

15. The Broker-Dealer operated an alternative trading system that marketed its services to retail investors to engage in day trading in securities listed on the NYSE and NASDAQ. It acted as an introducing broker and had an arrangement with another registered broker-dealer that cleared the transactions. The Broker-Dealer also operated its own proprietary trading program and acted as the counter-party for customer transactions when a buyer or seller was not otherwise available.

16. Ustocktrade owned and controlled the Broker-Dealer and managed certain of its operations. Importantly, Ustocktrade provided funding to the Broker-Dealer, using capital provided by Weeresinghe. In addition, Ustocktrade was responsible for operating the Broker-Dealer's customer trading platform; providing trade settlement services; providing customers with transaction confirmations, monthly account statements, and year-end tax reporting information; implementing trading compliance systems; creating and maintaining books and records in connection with the foregoing services; and providing the Broker-Dealer's payroll processing, HR services, benefits administration, and general facilities.

### II. The Net Capital Provisions

17. Section 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3), prohibits a broker-dealer from effecting any transaction in any security, through the use of the mails or any means or instrumentality of interstate commerce, in contravention of the rules and regulations that the

SEC prescribes in the public interest or to protect investors with respect to the financial responsibility and related practices of brokers-dealers. Rule 15c3-l promulgated under the Exchange Act ("Net Capital Rule"), 17 C.F.R. § 240.15c3-1, requires that a broker-dealer "must at all times have and maintain net capital" of no less than the minimum requirement applicable to its business.

18.     The Net Capital Rule is designed to ensure that broker-dealers have adequate liquid assets to meet their obligations to their customers and creditors.

19.     Section 15(c)(3) of the Exchange Act prohibits a broker-dealer from effecting securities transactions while not maintaining the required minimum net capital. The Net Capital Rule requires that a broker-dealer must at all times have and maintain net capital of no less than the minimum requirement applicable to its business. Here, based on the Broker-Dealer's business activity, it was required to maintain minimum net capital of $250,000. *See* 17 C.F.R. § 240.15c3-1(a)(1)(ii).

### III.    The Broker-Dealer's Net Capital Deficiencies

20.     From January 4, 2021 through November 18, 2021, the Broker-Dealer's net capital fell below the required minimum of $250,000 during 11 separate periods. After a net capital deficiency, Weeresinghe would provide a cash infusion to the Broker-Dealer, through Ustocktrade, to temporarily return the Broker-Dealer's capital levels above the required minimum. During each period of net capital deficiency, the Broker-Dealer continued to effect transactions for customers in securities listed on the NYSE and/or NASDAQ, notwithstanding requirements prohibiting such transactions while a broker-dealer fails to maintain the required net minimum capital.

21. Since the Broker-Dealer launched publicly in 2016, it never had a profitable year and experienced consistent net operating losses. And because the Broker-Dealer did not generate sufficient funds from its operations, it relied on cash infusions from Weeresinghe and Ustocktrade to comply with minimum net capital requirements.

22. In or about June 2021, an officer of the Broker-Dealer notified Weeresinghe that the Financial Industry Regulatory Authority ("FINRA") restricted the Broker-Dealer's business lines due to low net capital levels. In or about September 2021 and November 2021, an officer of the Broker-Dealer notified Weeresinghe that FINRA had suspended most operations of the Broker-Dealer due to net capital deficiencies.

23. By November 2021, Weeresinghe had depleted his personal resources and could no longer contribute capital to the Broker-Dealer to comply with net capital requirements. On November 18, 2021, the Broker-Dealer experienced its eleventh and final net capital deficiency. In late November 2021, with Weeresinghe personally out of money and unable to raise additional capital, the Broker-Dealer ceased operations. Weeresinghe directed the Broker-Dealer to transfer most of its remaining capital, approximately $147,000, to Ustocktrade to pay operating expenses, which worsened the Broker-Dealer's net capital deficiency.

24. After the SEC staff began its investigation, in December 2021, the Broker-Dealer voluntarily began liquidating its remaining assets under FINRA's oversight. In August 2022, FINRA expelled the Broker-Dealer from its membership for failing to file its audited annual report in violation of SEC and FINRA rules. In October 2022, the Broker-Dealer withdrew and terminated its registration with the SEC.

25. Each of the Broker-Dealer's net capital deficiencies, periods of deficiency, and amounts of deficiency are set forth below:

|     | **Deficiency Period** | **Net Capital on First Day of Deficiency** | **Deficiency Amount** |
| --- | --- | --- | --- |
| 1.  | 01/04/2021 | $233,416 | –$16,584 |
| 2.  | 01/15/2021 – 01/19/2021 | $231,702 | –$18,298 |
| 3.  | 01/20/2021 – 01/25/2021 | $225,519 | –$24,481 |
| 4.  | 01/29/2021 – 02/01/2021 | $238,788 | –$11,212 |
| 5.  | 02/02/2021 – 02/03/2021 | $237,285 | –$12,715 |
| 6.  | 02/10/2021 – 02/16/2021 | $244,139 | –$5,861 |
| 7.  | 02/17/2021 – 03/10/2021 | $160,972 | –$89,028 |
| 8.  | 05/19/2021 – 05/21/2021 | $242,510 | –$7,490 |
| 9.  | 06/01/2021 – 07/08/2021 | $234,751 | –$15,249 |
| 10. | 09/16/2021 – 09/28/2021 | $242,422 | –$7,578 |
| 11. | 11/18/2021 – Liquidation (December 2021) | $217,627 | –$32,373 |

### IV. Weeresinghe and Ustocktrade Aided and Abetted The Broker-Dealer's Net Capital Deficiencies

26. When the Broker-Dealer became net capital deficient, one of its officers typically contacted Weeresinghe by email or telephone to notify him of the dwindling or deficient net capital and to request a capital infusion. In many of these communications, the officer advised Weeresinghe of the Broker-Dealer's $250,000 net capital requirement, provided detailed computations of the Broker-Dealer's existing net capital, and requested that Weeresinghe provide cash to resolve the impending or existing net capital deficiencies. On several occasions, the officer also advised Weeresinghe that the Broker-Dealer was continuing its operations while net capital deficient, explained that this was unlawful, and recommended that the Broker-Dealer cease such operations. Despite the officer's warnings, Weeresinghe and Ustocktrade continued to operate the Broker-Dealer's trading platform to unlawfully effect securities transactions during each period when the Broker-Dealer was net capital deficient.

27. For example, on November 25, 2020, the Broker-Dealer officer emailed Weeresinghe and explained that the firm could not continue operations while net capital deficient:

> Could we please get some type of capital infusion, possibly on Friday? . . .
>
> [W]e only have $274,000 of net capital versus our minimum requirement of $250,000.  If at the end of any day coming up (which could even be today or Friday), our net capital collectively drops by more than $24,000, *we have to stop doing business* and make those notifications to FINRA and the SEC. . . .
>
> Even more concerning than notifying the regulators of a *business stoppage* would be taking all of the necessary steps to actually stop our business (which involves a lot of moving parts) for any period of time.  (Emphasis in original)

28. Later, during 2021, the Broker-Dealer officer notified Weeresinghe on multiple occasions that the Broker-Dealer was in fact net capital deficient.  For example, on January 5, 2021, the officer emailed Weeresinghe and other officers, stating that the "broker-dealer finished under net capital yesterday (we had an unusually poor operational day) at $233,416.  I've attached this net capital report (which is 1/4/2021) along with the prior day's report (12/31/2020).  Tony contributed $70,000 through Ustocktrade, LLC this morning to bring the broker-dealer back into capital compliance."  During this net capital deficiency, the Broker-Dealer continued to unlawfully effect securities transactions for its customers.

29. On January 13, 2021, the Broker-Dealer officer emailed Weeresinghe, stating that the Broker-Dealer's "net capital closed on Monday at about $251,000 (report attached), which of course is right over the requirement line. . . . Tony, you may need to contribute more capital."  The Broker-Dealer became net capital deficient two days later, on January 15, during which time it continued to unlawfully effect securities transactions for its customers.

30. About one week later, on January 21, 2021, the Broker-Dealer officer emailed Weeresinghe regarding another net capital deficiency: "I just left you a voicemail stating that

8

our estimated net capital close of business yesterday 1/20/2021 was $229,000. Please let me know if you can contribute capital before the bank closing today. If not, I don't think we should open for business tomorrow. Net capital is too low, and we are going to run into a problem."

This net capital deficiency was not resolved until January 25, 2021, but the Broker-Dealer continued to unlawfully effect securities transactions for its customers throughout the deficiency period.

31. On January 25, 2021, the Broker-Dealer officer sent another email to Weeresinghe and other officers, notifying them of net capital violations:

> We closed Thursday 1/21/21 with net capital of $171,000 (report attached). Tony tried to make a $75,000 contribution on Friday, but to this point in time (Monday morning), it (a check) hasn't yet cleared. Even if the contribution had been available first thing on Friday morning, we still would have been short capital at $246,000.
>
> That means that we opened for business on Friday with a net capital violation. It is likely that because the contribution didn't clear on Friday, that we conducted business all day on Friday in a net capital violation.
>
> I don't think we should start doing business today, Monday 1/25/2021 until we assess net capital and return to compliance. It is very unlikely that the $75,000 contribution (once it clears) is going to put us into net capital compliance.

32. On January 29, 2021, the Broker-Dealer officer emailed Weeresinghe: "Hi Tony, I've attached yesterday's close of business Net Capital Report. We had only about $254,000 of net capital. The week (and the month) are winding down here these few hours. If you could contribute more capital this afternoon, it would put us in a better position for January. In any event, we of course, need more capital regardless." The Broker-Dealer became net capital deficient later that day, during which time it continued to unlawfully effect securities transactions for its customers.

33. Three days later, on February 1, 2021, the Broker-Dealer officer emailed Weeresinghe regarding the most recent net capital violation: "The broker-dealer finished January in a net capital violation, with only $239,000 of net capital (report attached). We need a capital contribution. I will notify FINRA and the SEC about this net capital violation this afternoon." The net capital deficiency was not resolved until February 3, 2021, but the Broker-Dealer continued to unlawfully effect securities transactions for its customers throughout the deficiency period.

34. On February 12, 2021, the Broker-Dealer officer emailed Weeresinghe regarding yet another violation: "We fell below net capital at close of business Wednesday 2/10/2021 and remained under net capital through close of business yesterday Thursday 2/11/2021 (reports attached). Our net capital at 2/11/2021 was $224,994. Tony, please advise if there are any capital contributions forthcoming." This net capital deficiency was not resolved until February 16, 2021, but the Broker-Dealer continued to unlawfully effect securities transactions for its customers throughout the deficiency period.

35. On September 16, 2021, the Broker-Dealer officer emailed Weeresinghe: "[T]he net capital from yesterday (report attached) shows barely over $250,000 (the requirement). It does not appear that the firm should be presently operating without additional capital." The Broker-Dealer became net capital deficient later that day, during which time it continued to unlawfully effect securities transactions for its customers.

36. On November 23, 2021, the Broker-Dealer officer emailed Weeresinghe regarding additional violations, stating: "I've attached the 11/22/2021 net capital computation report, which shows that the firm had net capital of $208,253. . . . Please let us know of the capital contribution as soon as you can." This net capital deficiency was never resolved but the

Broker-Dealer continued to unlawfully effect securities transactions for its customers for several days before it ceased brokerage operations.

37. The Broker-Dealer officer provided similar emails and telephone calls to Weeresinghe throughout 2021, concerning each of the Broker-Dealer's 11 periods when it was net capital deficient.

38. At all relevant times, Weeresinghe decided whether to make any capital infusions to the Broker-Dealer, including the amounts and dates of any infusions. When Weeresinghe made capital contributions to the Broker-Dealer, he often used his personal funds to do so.

39. Weeresinghe typically provided cash infusions in amounts sufficient to bring the Broker-Dealer only slightly above its $250,000 net capital requirement. These funding practices often resulted in adequate capital for only days or weeks of operations, after which the Broker-Dealer again became net capital deficient.

40. At all relevant times, Weeresinghe controlled Ustocktrade through which he made all contributions to the Broker-Dealer and which operated the Broker-Dealer's trading platform to unlawfully effect securities transactions when the Broker-Dealer was in a net capital deficiency.

## CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 15(c)(3) of the Exchange Act and Rule 15c3-l Thereunder**

**(Against Defendants Ustocktrade LLC and Anthony Weeresinghe)**

41. Paragraphs 1 through 40 above are re-alleged and incorporated by reference.

42. By engaging in the conduct alleged above, the Broker-Dealer became net capital deficient and effected securities transactions during 11 periods in 2021 when it was net capital

deficient. As such, the Broker-Dealer violated Section 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3), and Rule 15c3-1 thereunder, 17 C.F.R. § 240.15c3-1.

43. By engaging in the conduct alleged above, Defendants Weeresinghe and Ustocktrade knowingly or recklessly provided substantial assistance to the Broker-Dealer in its violations of Section 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3), and Rule 15c3-1 thereunder, 17 C.F.R. § 240.15c3-1. As such, Weeresinghe and Ustocktrade aided and abetted the Broker-Dealer's violations of Section 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3), and Rule 15c3-1 thereunder, 17 C.F.R. § 240.15c3-1. Weeresinghe and Ustocktrade are thus liable for aiding and abetting the foregoing violations under Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

A. Finding that Defendants aided and abetted violations of Section 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3), and Rule 15c3-l thereunder, 17 C.F.R. § 240.15c3-1;

B. Permanently restraining and enjoining Defendants from violating Section 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3), and Rule 15c3-l thereunder, 17 C.F.R. § 240.15c3-1;

C. Ordering Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and

D. Granting any other relief that the Court deems appropriate or equitable.

**JURY DEMAND**

The SEC demands a trial by jury on all issues so triable.

Date: August 2, 2023              Respectfully submitted,

/s/ Timothy K. Halloran
Timothy K. Halloran (*pro hac vice* to be filed)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Tel: 202-551-4414
Email: hallorant@sec.gov

Of Counsel:

Lisa Deitch
Stephen LeBlanc
Securities and Exchange Commission